UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


JOHN RUTHELL HENRY,

       Petitioner,

v.                                 Case No. 8:07-cv-406-T-23TBM
                                          **Death Case**
JAMES McDONOUGH,
Secretary, Florida Dep't of Corrections,

       Respondent.
_____/


## O R D E R

      Henry petitions for the writ of habeas corpus under 28 U.S.C. § 2254 (Doc. 1) and

challenges the validity of his conviction for murdering Eugene Christian.  The petition

asserts one ground for relief—ineffective assistance of counsel during the guilt phase.

The respondent admits (Doc. 8 at 1-2) that this claim is free from any procedural bar.

Numerous exhibits ("Respondent's Exhibit __") support the response (Doc. 12) on the

merits.  Henry replies (Doc. 16) and the respondent concludes with a rejoinder

(Doc. 18).

## BACKGROUND

      Henry was charged with two capital murders, each occurring shortly before

Christmas, 1985.  The first victim was Henry's estranged wife, Suzanne, whom he killed

in Pasco County.  Henry was convicted and sentenced to death for the murder of

Suzanne, but the conviction and sentence were reversed.  Henry v. State, 574 So. 2d

73 (Fla. 1991).  On retrial, Henry was again convicted and sentenced to death, and the appellate court affirmed.  <u>Henry v. State</u>, 649 So. 2d 1366 (Fla. 1994), <u>cert. denied</u>, 515 U.S. 1148 (1995).  Henry's petition for the writ of habeas corpus under 28 U.S.C. § 2254 was denied, <u>Henry v. Crosby</u>, 8:04-cv-168-T-26TBM, which denial was affirmed.  <u>Henry v. Sec'y, Dep't of Corr.</u>, 490 F.3d 835 (11th Cir. 2007).

Henry's second murder victim was Eugene Christian, Suzanne's son and only child, who was also Henry's step-son.  Henry abducted Eugene in Pasco County and, after killing Suzanne and transporting Eugene to Hillsborough County, Henry murdered Eugene.

Henry's first conviction and sentence for murdering Eugene were reversed on direct appeal and remanded for a new trial.  <u>Henry v. State</u>, 574 So. 2d 66 (Fla. 1991) ("<u>Henry I</u>").  Henry was again convicted of first degree murder and sentenced to death; both the conviction and the sentence were affirmed.  <u>Henry v. State</u>, 649 So. 2d 1361 (Fla. 1994) ("<u>Henry II</u>").  The denial of post-conviction relief was affirmed.  <u>Henry v. State</u>, 948 So. 2d 609 (Fla. 2006) ("<u>Henry III</u>").

The facts of Eugene's murder are established:

Eugene's death originated from a dispute that occurred on December 22, 1985, in Pasco County, between John Ruthell Henry ("Henry") and his estranged wife, Suzanne Henry ("Suzanne").  It ended when Henry, by his own admission, "freaked out," stabbed Suzanne thirteen times in the neck, and covered her body with a rug.  According to Henry, he then picked up her son, Eugene, who was watching television in another room, and drove the child to Plant City in Hillsborough County.  The two stopped a number of times to purchase beer and cocaine for Henry and a snack for the child. Henry smoked some of the cocaine as he drove.  On the way back to Pasco County, Henry thought he saw flashing lights in the background.  He pulled over into an isolated area where the car got stuck in the mud.  Henry

and Eugene walked a short distance.  Henry stopped to smoke more cocaine, took Eugene on his knee, and stabbed the boy to death.

Two days later, Henry led the police to Eugene's body.  The police had arrested Henry in connection with Suzanne's murder.  After reading Henry his Miranda rights, Detective Fay Wilber questioned Henry about Eugene's whereabouts.  At one point in the interview, Detective Wilber stood up and said that he was going to leave and find the boy without Henry's help.  After this, Henry confessed.  He told Detective Wilber that Eugene was in Plant City, that the boy was not alive, and that he would lead the police to the crime scene.  At the crime scene, the police discovered the five-year-old's body with five stab wounds in the neck.  Henry recounted the details of what happened on December 22 to the police and confessed to murdering both Suzanne and Eugene.

Henry III, 948 So. 2d at 612.

During the guilt phase the jury convicted Henry of first-degree murder and during the penalty phase, by a vote of 11-1, the jury recommended death.[1]  (Respondent's Exhibit B-3 at 423)  The trial judge found two aggravating factors[2] and afforded some weight to two statutory mitigating factors[3] and six non-statutory mitigating factors.[4] (Respondent's Exhibit B-3 at 442-47)  The trial judge imposed a sentence of death because she determined that "the aggravating factors outweigh the mitigating circumstances in this case."  (Respondent's Exhibit B-3 at 447)

---

[1]  In the first trial, the jury recommended death by a vote of 10-2.

[2]  The aggravating factors are "(1) Henry had previously been convicted of another capital felony; and (2) the murder was committed during the course of a kidnapping." Henry II, 649 So. 2d at 1363.

[3]  The statutory mitigating factors are "(1) the murder was committed while Henry was under the influence of extreme mental or emotional disturbance; and (2) Henry's capacity to appreciate the criminality of his conduct or conform to the requirements of law was substantially impaired." Henry II, 649 So. 2d at 1363, n.6.

[4]  The non-statutory mitigating factors are "(1) Henry pled guilty and turned himself in for the murder of his first wife; (2) Henry was cooperative with law enforcement; (3) Henry exhibited good conduct in jail; (4) Henry was good to Christian while he was alive and is truly remorseful for the murder; (5) Henry has a history of drug and alcohol abuse; and (6) Henry fell as a child and suffered some brain injury." Henry II, 649 So. 2d at 1363, n.6.

**STANDARD OF REVIEW**

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs

this action.  Wilcox v. Florida Dep't of Corr., 158 F.3d 1209, 1210 (11th Cir. 1998), cert.

denied, 531 U.S. 840 (2000).  Section 2254(d), which creates a highly deferential

standard for federal court review of a state criminal adjudication, states in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect
> to any claim that was adjudicated on the merits in State court proceedings
> unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an
> > unreasonable application of, clearly established Federal law, as
> > determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable
> > determination of the facts in light of the evidence presented in
> > the State court proceeding.

In Williams v. Taylor, 529 U.S. 362, 412-13 (2000), the Supreme Court

elaborated this deferential, statutory standard of review:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal
> habeas court to grant a state prisoner's application for a writ of habeas
> corpus with respect to claims adjudicated on the merits in state court.
> Under § 2254(d)(1), the writ may issue only if one of the following two
> conditions is satisfied—the state-court adjudication resulted in a decision
> that (1) "was contrary to . . . clearly established Federal Law, as
> determined by the Supreme Court of the United States," or (2) "involved an
> unreasonable application of . . . clearly established Federal law, as
> determined by the Supreme Court of the United States."  Under the
> "contrary to" clause, a federal habeas court may grant the writ if the state
> court arrives at a conclusion opposite to that reached by this Court on a
> question of law or if the state court decides a case differently than this
> Court has on a set of materially indistinguishable facts.  Under the
> "unreasonable application" clause, a federal habeas court may grant the
> writ if the state court identifies the correct governing legal principle from
> this Court's decisions but unreasonably applies that principle to the facts of
> the prisoner's case.

- 4 -

"The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, . . . an unreasonable application is different from an incorrect one." Bell v. Cone, 535 U.S. at 694. See Brown v. Head, 272 F.3d 1308, 1313 (11th Cir. 2001) ("It is the objective reasonableness, not the correctness per se, of the state court decision that we are to decide."). The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme court "as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. at 412.

The purpose of federal review is not to re-try the state case. "The [AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002). Federal courts must afford due deference to a state court's decision. "AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." Renico v. Lett, ____ U.S. ____, 130 S. Ct. 1855, 1866 (2010).

Henry bears the burden of overcoming by clear and convincing evidence a state court factual determination. "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). This presumption of correctness applies to a finding of fact but not to a mixed

determination of law and fact.  Parker v. Head, 244 F.3d 831, 836 (11th Cir.), cert.

denied, 534 U.S. 1046 (2001).

## INEFFECTIVE ASSISTANCE OF COUNSEL

Two attorneys represented Henry at the second trial for murdering Eugene.

Henry contends that, during the guilt phase, trial counsel provided ineffective

assistance because they disclosed too much prejudicial information about Henry's past.

Ineffective assistance of counsel is a difficult claim to sustain.  "[T]he cases in which

habeas petitioners can properly prevail on the ground of ineffective assistance of

counsel are few and far between."  Waters v. Thomas, 46 F.3d 1506, 1511 (11th Cir.

1995) (en banc) (quoting Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994)).  Strickland

v. Washington, 466 U.S. 668 (1984), governs an ineffective assistance of counsel

claim:

> The law regarding ineffective assistance of counsel claims is well settled
> and well documented.  In Strickland v. Washington, 466 U.S. 668, 104
> S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court set forth a
> two-part test for analyzing ineffective assistance of counsel claims.
> According to Strickland, first, the defendant must show that counsel's
> performance was deficient.  This requires showing that counsel made
> errors so serious that counsel was not functioning as the "counsel"
> guaranteed the defendant by the Sixth Amendment.  Second, the
> defendant must show that the deficient performance prejudiced the
> defense.  This requires showing that counsel's errors were so serious as to
> deprive the defendant of a fair trial, a trial whose result is reliable.
> Strickland, 466 U.S. at 687, 104 S. Ct. 2052.

Sims v. Singletary, 155 F.3d 1297, 1305 (11th Cir. 1998).

Strickland requires proof of both deficient performance and consequent

prejudice.  Strickland, 466 U.S. at 697 ("There is no reason for a court deciding an

ineffective assistance claim . . . to address both components of the inquiry if the

defendant makes an insufficient showing on one."); Sims, 155 F.3d at 1305 ("When applying Strickland, we are free to dispose of ineffectiveness claims on either of its two grounds.").  "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690.  "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  466 U.S. at 690.  Strickland requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."  466 U.S. at 690.

Henry must demonstrate that counsel's error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." 466 U.S. at 691-92.  To meet this burden, Henry must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  466 U.S. at 694.

Strickland cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690-91.  Henry cannot meet his burden merely by showing that the avenue chosen by counsel proved unsuccessful.

> The test has nothing to do with what the best lawyers would have done.
> Nor is the test even what most good lawyers would have done.  We ask
> only whether some reasonable lawyer at the trial could have acted, in the
> circumstances, as defense counsel acted at trial . . . .   We are not
> interested in grading lawyers' performances; we are interested in whether
> the adversarial process at trial, in fact, worked adequately.

White v. Singletary, 972 F.2d 1218, 1220-21 (11th Cir. 1992).  Accord Chandler v.

United States, 218 F.3d 1305, 1313 (11th Cir. 2000) ("To state the obvious:  the trial

lawyers, in every case, could have done something more or something different.  So,

omissions are inevitable . . . .  [T]he issue is not what is possible or 'what is prudent or

appropriate, but only what is constitutionally compelled.'") (en banc) (quoting Burger v.

Kemp, 483 U.S. 776, 794 (1987)).  See also Jones v. Barnes, 463 U.S. 745, 751 (1983)

(counsel has no duty to raise a frivolous claim).

Henry must prove that the state court's decision was "(1) . . . contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined

by the Supreme Court of the United States or (2) . . . based on an unreasonable

determination of the facts in light of the evidence presented in the State court

proceeding."  28 U.S.C. § 2254(d).  In Henry III, 948 So. 2d at 611 and 616-17, the

Florida supreme court recognizes that Strickland controls a claim of ineffective

assistance of counsel.  Consequently, Henry cannot meet the "contrary to" test in

Section 2254(d)(1).  Instead, Henry must show that the state court unreasonably

applied Strickland or unreasonably determined the facts.  In determining

"reasonableness," a federal petition for the writ of habeas corpus authorizes

determining only "whether the state habeas court was objectively reasonable in its

Strickland inquiry."  Putnam v. Head, 268 F.3d 1223, 1244 n.17 (11th Cir. 2001), cert.

denied, 537 U.S. 870 (2002).

## ANALYSIS

With the advantage of hindsight—that is, with the benefit of knowing about the

defense's failed strategy at Henry's first trial for murdering Eugene (and at his two trials

for murdering Suzanne)—trial counsel formulated their belief as to the best strategy for

the defense at the second trial.  From that superior vantage, each of Henry's two trial

counsel—with Henry's specific consent—decided that the penalty phase deserved their

primary focus because a "not guilty" verdict was "highly unlikely."  Consequently, the

strategy employed at the guilt phase included revealing Henry's other murder

convictions and sentences with the hope that the defense would retain with the jurors a

useful store of credibility for deployment during the penalty phase.  Henry claims that

trial counsel rendered ineffective assistance by pursuing that defense strategy.

Because of the presumption of correctness and the highly deferential standard of

review, the analysis of Henry's claim begins with the state court's analysis.  Henry II,

948 So. 2d at 614-16, framed this claim as follows:

> Henry's third claim was that his counsel was ineffective for leading him to
> testify that he (1) had earlier been convicted of stabbing Patricia Roddy; (2)
> had served only half his sentence for this crime; and (3) had been given
> the death penalty for Suzanne's murder.  In denying this claim, the trial
> court found that defense counsel "made a tactical, strategic decision, with
> the joint consent of both co-counsel, Mr. Wells, and the Defendant to
> disclose the Roddy murder to the jury during the guilt phase."  It also found
> that the decision to disclose Henry's sentence for the Roddy murder and
> his death sentence for Suzanne's murder were "tactical, strategic
> decisions."  Moreover, it recognized that the decisions were made by the
> lead defense counsel, who had significant trial court experience.  [fn.9]

9.  The trial court found that Henry's lead counsel, William Fuente, had "extensive criminal experience both prosecuting and defending capital cases prior to representing [Henry]." Fuente testified that he spent five years in the state attorney's office where he handled many murder prosecutions and was eventually appointed division chief and special prosecutor.  In 1980, twelve years before he defended Henry, he went into private practice as a defense attorney.  His practice focused on state trial and appellate work, although he did some federal trial and appellate practice work as well.  He testified that he had handled "between 10 and 15 capital cases" before representing Henry, and "probably 5 of these went to trial as death penalty cases."  Two or three of the death penalty cases resulted in a sentence of death.

At the evidentiary hearing, Henry's lead defense counsel, William Fuente, testified to the dire situation facing defense counsel as they approached Henry's second trial for Eugene's murder and the fourth trial for the events surrounding Eugene's death:

[F]rom our perspective it was a very difficult case.  First of all, [Henry] had been convicted once before.  Secondly . . . the underlying facts were that he had confessed to the authorities to the offense . . . so that was difficult . . . .  And beyond that . . . there was a lot of other evidence beyond this confession that implicated him in the offense.

Defense counsel also testified that its trial strategy was to disclose everything:

Well, the decision to proceed the way we did, and this is to let Mr. Henry testify and acknowledg[e] everything, was arrived at . . . within a couple of months of the trial commencing.  And my recollection of this we had a—we had a meeting, Mr. Henry, Mr. Wells [defense co-counsel] and myself . . . just throwing the idea around.  At the time, the thinking was that [Henry] had already been convicted once of his offense . . . and then again in [Pasco] County of a homicide that occurred previously, and based upon our assessment of the evidence the state had against him, it was highly unlikely we were going to achieve an acquittal.  So our best hope—our thought was our best hope was to try to achieve, number 1, a conviction on a lesser on some defense where we could get into the—his mental history, and the only way that could happen was we

- 10 -

would agree with an insanity or a voluntary intoxication defense, and we chose the latter.  We excluded considering the insanity defense because of the, really the flip-flopping of one or two of the doctors.

. . . .

And the other concern was that after discussing with Mr. Henry my having been in this situation before and Mr. Wells having been in this situation whereby if we approached this case on a pure not guilty, then denying the offense, if you will, it would have likely culminated in a situation where that jury would not have known, likely would not have known about . . . the Pasco County murder, which happened very shortly before and the Roddy murder which happened some ten years before.  So we would have been faced with a client whose jury just found him guilty and then at penalty phase for the first time that jury would have known about two other homicides. We were almost certain that would result in a recommendation of death.  *So our strategy, if you will, was to lay it all out on the table so that the jury would not be surprised, they would know everything there was to know and again, that was a calculated decision on all our parts.*

(Emphasis added.)  Moreover, defense counsel testified that this decision was specifically discussed with Henry in advance and that Henry consented to it:

I [Henry's trial counsel] have a photographic recall of one brief part of that interview and I remember myself saying . . . to the other two, Mr. Henry and Mr. Wells, what do you folks think about us letting everything hang out . . . and I recall we had further discussions and we certainly contemplated pros and cons . . . and I remember reaching that consensus.

Next Henry III, 948 So. 2d at 617-21, in a detailed analysis, both recognizes

that Strickland governs this issue and applies Strickland to this claim as follows:

Applying this two-prong test from Strickland, we find that Henry has failed to establish that his counsel's performance was deficient in making the decision—well before trial and with Henry's informed consent—to question Henry about Patricia Roddy's murder, the sentence he served for this crime, and the death sentence he received for Suzanne's murder.  While

- 11 -

this testimony would not otherwise have been admissible if it had not been raised by the defendant on direct examination, [fn.10] we recognize that the facts of this case would lead reasonably prudent defense counsel to believe there was a strong likelihood Henry would be convicted in the guilt phase and, therefore, that counsel would need to consider the impact of the guilt phase on the penalty phase.  See Florida v. Nixon, 543 U.S. 175, 191, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004) (recognizing that the gravity of the potential sentence in a death penalty trial and the two-tier proceeding "vitally affects counsel's strategic calculus" when approaching a death penalty case).  Henry had confessed to brutally stabbing to death his five-year-old stepson hours after he killed the child's mother in a similar manner.  Three prior juries had recommended Henry be sentenced to death for these crimes.  Confronted with this reality, defense counsel was obligated to prepare a strategy that considered not only the guilt phase, but also the penalty phase.  Given these circumstances, we do not find the decision to question Henry about his past criminal record to be outside the wide range of professionally competent assistance.  See Strickland, 466 U.S. at 690, 104 S. Ct. 2052 (defining "deficient performance" as "outside the wide range of professional competence").

     10.  See §§ 90.404(2)(a), 90.610, Fla. Stat. (2004) (stating that evidence of prior crimes is not admissible to establish propensity, but may be admissible to impeach a witness).

The decision to question Henry about these otherwise inadmissible facts was jointly reached.  It was part of a deliberate strategy to avoid a death sentence, suggested by highly experienced criminal defense attorneys and agreed to by Henry.  Fuente testified that "a couple months before trial," he, Henry, and co-counsel Wells met to discuss possible trial strategies.  The decision to reveal Henry's past criminal history began as an idea that they were "just throwing . . . around."  However, after "further discussions" and "contemplat[ing] the pros and cons," they mutually decided it was the best available option.

Fuente's testimony portrays the extremely difficult situation defense counsel faced in preparing for Henry's second trial for Eugene's murder.  Not only had Henry been convicted of first-degree murder in each prior trial involving the deaths of Eugene and Suzanne, a jury had recommended the death sentence in each of these trials.  This recommendation was unanimous in both trials for Suzanne's murder, and affirmed by a strong vote of ten to two in the prior trial for Eugene's murder.  Moreover, counsel recognized that underlying each of these recommendations was a very strong case for the State in the guilt phase. As Fuente testified, "the facts as I remember them, the underlying facts were that [Henry] had confessed

to the authorities . . . .  And beyond that . . . there was a lot of other evidence . . . that implicated [Henry] in the offense."  In light of this, Fuente expressed a fear that withholding information regarding Henry's prior background

> would have likely culminated into a situation where the jury would not have known, likely would not have known about the . . . [Pasco] County murder, which happened very shortly before and the Roddy murder which happened some ten years before.  *So we would have been faced with a client whose jury just found him guilty and then at [the] penalty phase for the first time that jury would have known about the two other homicides.  We were almost certain that would result in a recommendation of death.*

(Emphasis added.)  Therefore, the defense strategy was "to lay it all out on the table so that the jury would not be surprised."  In Fuente's words,

> The potential benefit [of telling the jury about the Roddy homicide in the guilt phase], as [defense counsel] perceived it, was simply to let the jury know everything there was to know upfront, be completely candid, and if they returned a verdict of first degree murder, there would be no surprise, nothing more for them to consider, nothing more aggravating if you will [in the penalty phase].

In reaching this strategic decision, defense counsel and Henry considered other alternatives.  Fuente testified that both Henry and co-counsel Wells agreed to this unusual strategy after several meetings in which they considered its pros and cons.  In doing so, they considered the available defenses, including insanity.  An insanity defense was abandoned because the experts "flip-flopp[ed]" on whether the defendant was insane, making it unlikely the jury would render a verdict of not guilty based on insanity. Defense counsel believed Henry's "best hope" was to present a voluntary intoxication defense and argue for a lesser included offense; but, given the strong evidence against Henry and that the prior jury had rejected the evidence in support of this defense, counsel had to anticipate and be prepared for a penalty phase.

We have repeatedly rejected claims of ineffective assistance of counsel when the allegedly improper conduct was the result of a deliberate trial strategy.  See Lawrence [v. State], 831 So.2d [121], 129 [(Fla. 2002)] (citing Shere v. State, 742 So. 2d 215, 220 (Fla. 1999), for the proposition that "[t]his Court has held that defense counsel's strategic choices do not

- 13 -

constitute deficient conduct if alternative courses of action have been considered and rejected"); see also Patton, 878 So. 2d at 373 (citing Shere for the same proposition). Indeed, the facts of this case closely parallel Shere.

In Shere, this Court rejected an ineffectiveness claim based on defense counsel's strategic decision to offer evidence of a codefendant's admission during the guilt phase. 742 So. 2d at 219-20. The Court found that "[a]t the conclusion of the State's case, the defendant was in a desperate situation," because "[t]he State's case-in-chief did not leave any doubt that the defendant played a major role in the murder." Id. (quoting trial court's order). This Court also relied on the fact that "defendant was represented by a highly competent and ethical trial attorney" who had made a "tactical decision after considering all of the evidence against his client and after considering all other alternatives." Id. (quoting trial court's order).

The same is true in Henry's case. Fuente had more than fifteen years of experience litigating criminal cases before he represented Henry. He had tried numerous capital murder cases, five of which involved the death penalty. Cf. Atwater v. State, 788 So. 2d 223, 230 (Fla. 2001) (relying, in part, on defense counsel's seventeen years of experience in criminal litigation and the fact that counsel had handled five or six capital cases to find that a preplanned strategy to concede defendant's guilt to a lesser crime was not "reviewable under Strickland"). When it became time to present Henry's defense, Fuente knew he would be facing a situation at least as desperate as the defendant's in Shere. At the time he rose to present Henry's case, the State would have just presented overwhelming evidence that Henry had brutally murdered his five-year-old stepson hours after he had brutally murdered the boy's mother. This evidence would have included the details of Suzanne's murder, as this Court had previously determined that the facts were "inextricably intertwined with [Eugene's] murder" and, therefore, admissible. Henry v. State, 649 So. 2d at 1364-65. The State's case would also have included Henry's detailed confession to the police and the fact that Henry had led the police to the boy's body. As noted earlier, a prior jury had convicted Henry of first-degree murder based on these facts and recommended a sentence of death by a vote of ten to two. It is not unreasonable for defense counsel, when faced with these circumstances, to believe that extreme measures might be necessary in order to maintain credibility with the jury throughout both phases of the trial.

Both this Court and the United States Supreme Court have recognized the appropriateness of the end Fuente sought to achieve. In Atwater, this Court recognized the importance of establishing credibility with the jury.

- 14 -

788 So. 2d at 229-30.  The Court found that defense counsel was not deficient for conceding defendant's guilt of second-degree murder in its closing argument and supporting this concession by showing photographs of the crime scene to the jury.  Id. "In light of the evidence against Atwater, defense counsel properly attempted to maintain credibility with the jury by being candid as to the weight of the evidence." Id. at 231.

Similarly, as previously mentioned, the United States Supreme Court has recently recognized the importance of preparing for the penalty phase in death penalty cases.  "[T]he gravity of the potential sentence in a capital trial and the proceeding's two-phase structure vitally affect counsel's strategic calculus" in regard to deciding whether to concede guilt in the guilt phase.  Florida v. Nixon, 543 U.S. 175, 190-91, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004).  In cases like Henry's, where "the evidence is overwhelming and the crime heinous," id. at 191, 125 S. Ct. 551, "avoiding execution [may be] *the best and only realistic result possible.*" Id. at 190, 125 S. Ct. 551 (alteration in original) (emphasis added) (quoting Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, § 10.9.1 cmt. (rev. ed. 2003)).  Therefore, "in a capital case, counsel must consider in conjunction both the guilt and penalty phases in determining how best to proceed." Id. at 192, 125 S. Ct. 551 (emphasis added).

We recognize that these cases are distinguishable from Henry's in that Henry's counsel did not merely concede guilt to a lesser offense but led his client to testify to highly incriminating evidence that would otherwise have been inadmissible in the guilt phase.  This distinction, however, does not justify a finding that counsel's performance was deficient.  When determining ineffective assistance claims, our duty is "not to grade counsel's performance," Strickland, 466 U.S. at 697, 104 S. Ct. 2052, or to use the Sixth Amendment to "improve the quality of legal representation." Id. at 689, 104 S. Ct. 2052.  In hindsight, we might seriously question counsel's decision to introduce this evidence during the guilt phase.  But such a hindsight evaluation does not answer the question of whether counsel was deficient.  When determining whether counsel's performance is deficient, our duty is to make every effort "to eliminate the distorting effects of hindsight . . . [and] evaluate the conduct from counsel's perspective at the time [counsel prepared for trial]." Id. at 689, 104 S. Ct. 2052.  Viewed from this perspective, we find counsel's performance was not deficient.  Henry's highly experienced trial counsel reasonably believed Henry almost certainly faced a penalty phase proceeding and that the only chance of avoiding execution was complete candor with the jury.  They believed the only way to achieve this candor was to lead Henry to testify to these otherwise inadmissible facts during the guilt phase.  Henry agreed to

this strategy.  Given the unique circumstances of this case, we find Henry has failed to overcome the strong presumption that counsel's performance was not deficient.  See Strickland, 466 U.S. at 688-90, 104 S. Ct. 2052 (recognizing that defendants bringing an ineffectiveness claim must overcome a strong presumption and that courts must consider counsel's action in light of all the evidence in the case because "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the . . . range of legitimate decisions regarding how best to represent a criminal defendant").

## II. Prejudice

In most cases, our determination that Henry has failed to meet the first prong of the Strickland test would end any further analysis.  See Strickland, 466 U.S. at 697, 104 S. Ct. 2052 (authorizing courts to dispose of ineffectiveness claims after addressing only one prong of the analysis). Nonetheless, given the uniqueness of this case, we will address the second prong as well.

Even if we agreed with Henry that defense counsel's line of questioning constituted deficient performance, this deficiency would not warrant reversal because Henry has not established that counsel's actions prejudiced him.  To reiterate, Strickland requires defendants to show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  466 U.S. at 694, 104 S. Ct. 2052.  Such a "reasonable probability" is a "probability sufficient to undermine confidence in the outcome."  Id.  This second prong does not require proof that "counsel's deficient conduct more likely than not altered the outcome of the case."  Gaskin v. State, 822 So. 2d 1243, 1247 n.3 (Fla. 2002) (quoting Strickland, 466 U.S. at 693, 104 S. Ct. 2052).  Instead, it requires a showing that, in light of all the evidence surrounding his conviction, the conduct renders the results of the proceeding unreliable. Id. at 1247; see also Strickland, 466 U.S. at 694, 104 S. Ct. 2052.

Viewing this case in its entirety, we find that Henry has not satisfied this burden.  As explained above, defense counsel were confronted with an extremely strong case against their client.  They had to calculate the impact of the guilt phase testimony upon a likely penalty phase.  While Henry asserts that his defense of voluntary intoxication would have resulted in a conviction of a lesser included offense, thereby avoiding a penalty phase, he has failed to establish this claim.  He has not established a reasonable probability that the result of the guilt phase would have been different.  In other words, he has not proven this claim with a probability sufficient to undermine confidence in the outcome.  First,

voluntary intoxication is not a particularly strong defense to such crimes, and the evidence in support of this defense was weak.  The only direct evidence establishing that Henry was intoxicated at the time he killed Eugene was Henry's own testimony.  The two other lay witnesses presented at trial could only testify that Henry was intoxicated hours earlier—even before he killed Suzanne.  And for the murder of Suzanne, Henry again had received a death sentence in the second trial for her murder, an act "inextricably intertwined" with the case at hand.  Second, the trial court found that defense counsel adequately presented this defense through the testimony of two expert witnesses and three lay witnesses, including Henry himself.  Yet, the jury still rejected this defense.  In summary, Henry has still failed to establish a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

Henry adopts the argument in Judge Anstead's dissent, Henry III, 948 So. 2d at

624-25, summarized as follows:

I cannot concur in the majority's determination that Henry's counsel acted effectively and competently in choosing to elicit severely damaging evidence from his client that would have otherwise not been admissible during the guilt phase of Henry's trial.

. . . .

. . .  By choosing to voluntarily provide Henry's jury with this damning evidence of Henry's prior killings, defense counsel all but guaranteed his client's conviction in the instant case.

It is apparent that the decision to voluntarily put this damaging evidence before a jury charged with evaluating Henry's culpability for yet a third killing was not within any range of competent professional conduct by a qualified defense lawyer.  As with the fundamental oath of physicians, surely defense counsel's first obligation to his client is to do no harm.  That obligation was directly violated here, and cannot be swept under the rug as a "tactical" call by counsel.  Such "tactical decisions" have no place in our system of bifurcated trials for capital crimes.  If the right to effective representation is to have any meaning at all, we cannot approve such malfeasance by counsel.

The dissent not only disagrees with the majority but also chastises the majority

for ignoring the post-conviction court's supposed characterization of defense counsel's

conduct as "bad judgment." As Justice Wells's concurrence specifically pinpoints,

Henry III, 948 So. 2d at 622, the dissent commits the mis-characterization:

> I write only to respond to the dissenting opinion.
>
> I find unsupported in the trial court's order the statement in the dissent that the trial court characterized defense counsel's conduct as "bad judgment" in several places in its order.  What the trial judge actually said was:  "The court further finds that even if this Court finds that Judge Fuente's[5] tactical decision exhibited bad judgment, Defendant is not entitled to post conviction relief."  State v. Henry, No. 85-14273-D (Fla. 13th Cir. order filed Dec. 23, 2003), order at 8.
>
> I cannot locate and the dissent has not pointed to any finding by the trial judge that trial counsel exercised "bad judgment."  Rather, what the record clearly shows and the trial judge's order does repeatedly state, as the majority opinion sets forth, is that a very experienced trial counsel made a studied tactical decision.

The post-conviction court's order (Respondent's Exhibit D-7 at 1263-90) supports

Justice Wells's characterization and refutes the dissent's characterization.  Moreover,

the argument advocated by both the dissent and Henry is contrary to the cautionary

instructions in Nixon, 543 U.S. at 190-93:

> Although such a concession [(admitting defendant's guilt during the guilt phase)] in a run-of-the-mi[ll] trial might present a closer question, the gravity of the potential sentence in a capital trial and the proceeding's two-phase structure vitally affect counsel's strategic calculus.  Attorneys representing capital defendants face daunting challenges in developing trial strategies, not least because the defendant's guilt is often clear. Prosecutors are more likely to seek the death penalty, and to refuse to accept a plea to a life sentence, when the evidence is overwhelming and the crime heinous.  . . .  In such cases, "avoiding execution [may be] the best and only realistic result possible."  ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases § 10.9.1, Commentary (rev. ed. 2003) . . . .

---

[5]  Approximately two years after the second trial one of Henry's two trial counsel, William Fuente, was appointed a county judge and three years later a circuit judge.

Counsel therefore may reasonably decide to focus on the trial's penalty phase, at which time counsel's mission is to persuade the trier that his client's life should be spared.  Unable to negotiate a guilty plea in exchange for a life sentence, defense counsel must strive at the guilt phase to avoid a counterproductive course.  See Lyon, Defending the Death Penalty Case:  What Makes Death Different?, 42 Mercer L. Rev. 695, 708 (1991) ("It is not good to put on a 'he didn't do it' defense and a 'he is sorry he did it' mitigation.  This just does not work.  The jury will give the death penalty to the client and, in essence, the attorney."); Sundby, The Capital Jury and Absolution:  The Intersection of Trial Strategy, Remorse, and the Death Penalty, 83 Cornell L. Rev. 1557, 1589-1591 (1998) (interviews of jurors in capital trials indicate that juries approach the sentencing phase "cynically" where counsel's sentencing-phase presentation is logically inconsistent with the guilt-phase defense); id., at 1597 (in capital cases, a "run-of-the-mill strategy of challenging the prosecution's case for failing to prove guilt beyond a reasonable doubt" can have dire implications for the sentencing phase).  In this light, counsel cannot be deemed ineffective for attempting to impress the jury with his candor and his unwillingness to engage in "a useless charade."  See Cronic [v. United States], 466 U.S. [648], 656-657, n.19, 104 S. Ct. [2039], 2039 [(1984)].

Henry's trial counsel recognized that Henry occupied the same precarious position highlighted in Nixon and, after considering alternative defense strategies, both trial attorneys and Henry agreed on the strategy approved in Nixon.  Consequently, Henry III's deference to trial counsel's chosen strategy conforms comfortably with Nixon.

Henry strenuously challenges his trial counsel's strategy because admitting the information about his prior murders and sentences allegedly eviscerated any chance of the jury's both accepting his voluntary intoxication defense and returning a verdict for a lesser-included offense.  But Henry cites no risk that trial counsel failed to consider.  Trial counsel rejected using some of the medical expert testimony Henry contends counsel should have employed.

In his supporting memorandum (Doc. 7 at 2) Henry contends for rejection of the majority's decision in <u>Henry III</u> and pleads, "It is hoped that this court will disagree with that court  . . . ."  "Disagreeing" (even if that were the case) with the state court's decision is not the correct standard of review.  Instead, Henry must show that the state court's ruling was either an unreasonable application of <u>Strickland</u> or an unreasonable determination of the facts.  <u>See</u> <u>e.g.</u>, <u>Bell v. Cone</u>, 535 U.S. at 694 ("[A]n unreasonable application is different from an incorrect one.").  Henry fails both unreasonableness standards.  Consequently, the petition for the writ of habeas corpus lacks merit.

### CONCLUSION

The petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) is **DENIED**.  The clerk shall enter a judgment against Henry and close this case.

ORDERED in Tampa, Florida, on February 4, 2011.

_____
**STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE**